Well, welcome everyone to the 4th Circuit Court of Appeals. This morning, we got we have. 34 interesting cases and a lot of good lawyers. Judge Kenan 1 with us from her. Chambers in northern Virginia. Glad to be with you, Judge Kenan. And Judge Benjamin and I in colleagues for a few months, but this is the 1st time. We've heard any cases together, so this is it's a pleasure. I'm honored to be with you. And in our 1st case this morning. We got it. Appeal and across appeal United States versus Lizano. Mr. Bogand. Mr. Bograd, your honor. Good to have you with us, sir. Thank you, your honor. You're trying to intervene. We are trying to intervene that is correct. May it please the court. Louis Bograd Motley Rice LLC for the appellant intervenors, Enrique Lizano at all. The issues in this appeal are narrow and technical issues of statutory construction under the Federal Clean Air Act. And in a moment, I propose to walk the court through a careful and detailed textual analysis. But before I do that, I think some context setting is important. The underlying lawsuit initiated by EPA below was at least initially. A suit to enjoin the new indie pulp paper mill from continuing practices that constituted an imminent and substantial endangerment to the public health and welfare. Due to the mills release of excessive amounts of toxic air pollutants, including both hydrogen sulfide. And total reduced sulfur, which includes other noxious sulfur compounds such as methylmercaptan that are many times more toxic than H2 or hydrogen sulfide. The appellant intervenors are all neighbors of new Indy who live within approximately 10 miles of the mill. That's who you represent that is who we represent. Yes, your honor. And where is the mail? It's south of Charlotte. Yeah, it's it's it's in it. Yes, exactly. It's in South Carolina, but not within miles of the North Carolina border. So actually, the the containment zone in in this and the related litigation includes neighbors of the plant in both states. The intervenors are thus precisely the people whose health and welfare is being imminently and substantially endangered by new Indy's conduct. So, the essential question before the court is whether the victims of new Indy's violations of the Clean Air Act. Should have a right to intervene in an enforcement action brought by EPA for the very purpose of protecting their health. Where the relevant provision of the of the CAA, the Clean Air Act, says that a person may, quote, intervene as a matter of right when the EPA has commenced and is diligently prosecuting a civil action to require compliance with the same, quote, standard limitation or order that the citizen seeks to enforce. We think the answer to that question should be obvious. Of course, they should be able to intervene. And federal law expressly authorizes them to do so. But it was a discretionary call. No, your honor. The only issue, the only truly discretionary question here concerned the issue of permission, permissive intervention under federal rules of procedure. Twenty four B, the statutory language is absolutely clear. And I don't even believe that the EPA disagrees with us on this point. They disagree with us about whether we meet the standards for intervention under the statute. But there's no question that if we meet those standards, intervention is as a matter of right and it's not discretionary. It's important to note, at least in the particular factual circumstances presented here, that this is a question of first impression for this court under the CIA. In fact, it's a question of first impression impression at all in the entire history of the CIA. The EPA has brought fewer than 10 Section 303 actions for imminent and substantial endangerment, which I think gives you some sense of the significance of the harm that was being caused by the mill in this instance. And this is the very first case in which citizens have sought to intervene pursuant to Section 304 B1B of the act in such an imminent endangerment case. The textual analysis proceeds in several steps. Let me start, as we should, with the language of the statute. Section 304 A1 grants citizens a right to bring a claim, quote, against any person who is alleged to have violated, if there is evidence that the alleged violation has been repeated, or to be in violation of an emission standard or limitation under this chapter or an order issued by the administrator with respect to such a standard or limitation, unquote. Section 304 B1B, in turn, creates a bar to the action I just described in two circumstances, the relevant one here being where the EPA has brought and has commenced and is diligently prosecuting a civil action to require compliance with the same standard limitation or order. And the EPA brought just such – we contend that the 303 action that the EPA brought is just such an action. But 304 B1B says, while you can't bring your own suit if the EPA is diligently prosecuting, any person may intervene as a matter of right in the EPA action. Mr. Bograd? It has been held to be unconditional. Sorry. Yes, I'm sorry. You're sort of out of my field of vision. I apologize. Mr. Bograd, what was the emission standard or limitation that was the subject of the emergency petition? Was there one? There were multiple, Your Honor. And does that make a difference in your analysis? It does, Your Honor. You're jumping ahead of me just a little bit, but let me go there. Because the definition of emission standard or limitation under the Act is a multi-part definition, as we've laid out in the briefs. And we believe that the emergency order, specifically paragraph 52 of the emergency order, which identifies the precise steps that New Indy was required to take, meets virtually every one of the potential definitions of an emission standard or limitation. Most obviously, the emergency order, and this is at JA 46, paragraph 52B, says, Respondent must immediately begin taking steps to minimize air emissions of hydrogen sulfide to not exceed a facility fence line average concentration of 600 parts per billion over a rolling 30-minute period, and 70 parts per billion over a rolling seven-day period, as established through continuous monitoring. I don't know how you read that sentence and don't think that that constitutes a standard or limitation. It quite expressly does. But in addition to that, and I can direct you to the specific provisions of definitional sections in the Clean Air Act, as we have in the brief, creating a scheduler timetable for compliance also qualifies as a standard or limitation on emissions under the Clean Air Act. But the emergency order has expired, isn't that correct? The emergency order has expired, Your Honor, but the lawsuit that the EPA brought was a lawsuit to continue in effect the requirements of the emergency order. It was expressly an attempt to require compliance with the standard. Right, I understand, but what I'm trying to get at, is there a current limitation or emission standard that is in effect? There is a current standard limitation. It has obviously now been codified in the consent decree. Right, but I'm saying prior to the decree. I'm sorry, Your Honor, I missed that. No, that's okay. You go ahead. Thank you. I have a question. Sure. Is it your position that once the 60 days expired and the civil action was to extend, I guess is the way the EPA has stated, is that the civil action when you mean is triggered, I guess at that point, is it triggered for the intervention? Are you asking to intervene during the 60 days? No, we have not. No, in fact, the statute section 304B1B specifically says we have a right to our own suit. We would have had a right to bring our own suit during the 60 days because during that period of time, there was no civil action brought by the EPA. It's only when the EPA commenced and diligently prosecuted, and we can argue about how diligent it was, but we have not taken issue with that question here. When they filed the suit, that triggers, that takes away our right to file our own independent action, but triggers our right to intervene and argue. Even though they filed it under 303, which was the emergency. Your Honor, we don't believe that that makes any difference at all. As we explain at length in the brief, the statute defines the actions that will allow you to intervene or to bring your own section 304A1 action in terms of violations of emission standards and limitations or enforcement of emission standards and limitations. It doesn't define the right to intervene or the right to bring your own suit in terms of particular causes of action under the statute. And indeed, the EPA's position really makes no sense. I mean, the EPA has two different sources of authority, both of which I should point out they have invoked in this case. They have an authority to bring a 303 action to essentially continue to enforce the 60-day administrative emergency order. And they also have an authority under Section 113 of the Act to seek penalties for violations of the emergency order, which they did here. So while they didn't initially style their action as an action under Section 113, they clearly invoked Section 113 ultimately in seeking penalties. But the point is Section 304, the section that gives us the right to intervene, doesn't mention any sections at all. It doesn't say you can intervene under 303, but it also doesn't say you can intervene under 113. Indeed, it just doesn't speak in terms of sections at all, and that makes perfect sense because 113 and 303 are sections that only authorize the EPA to sue. 304 is the section that authorizes citizens to sue. So it's the substance of the action, not the statutory cause of action that matters. Here, every bit of language in the definition of an emission standard or limitation that is as it is defined in the Clean Air Act is met by the language, by the fact that this case, they, you know, the emergency order asked them or ordered them to reduce their level of emissions. It ordered them to set a timetable and a procedure for compliance with the Act. It set performance standards they had to meet on an ongoing basis. Each of the sub-definitions of an emissions standard or limitation under the Act was fully satisfied by the terms of the emergency order that EPA sought to enforce. It was therefore entirely appropriate for the interveners to seek to intervene, to join in that action, particularly when they became concerned that EPA was allowing the mill to get away with a prolonged delay in implementing and coming into compliance with the terms of the order. What did Judge Leiden get wrong? Well, Your Honor, the principal thing Judge Leiden got wrong was that Judge Leiden believed that because this was an action under 303, that somehow Section 303 was exempt from this provision that authorizes intervention in 304. There's just, there's no basis for that holding. As I just explained, the statute does not link the right to intervene to the particular cause of action the EPA brings. It links it to the nature of the violations of the Clean Air Act that the EPA is seeking to enforce, and we think they were fully satisfied here. I think Judge Leiden was in part misled by the decision, the Second Circuit decision in Hooker, which involved not the Clean Air Act, but the Clean Water Act and RCRA, but I don't think that's the critical distinction here. The critical distinction was there were no, in that case, effluent standards or admissions that were at issue in Hooker. Indeed, in that case, the prospective intervener, and this is a quote from page 749F2nd980, the prospective intervener conceded that a literal interpretation of the Clean Water Act would bar its participation in that action because they weren't asking to enforce an effluent standard or effluent limitation that the EPA had ordered. They were, in fact, asking the court to set its own, to define an effluent standard or limitation that's met the standard for imminent and substantial endangerment, and the court said, no, that's not, you know, essentially that's not our job. That the citizen's supervision is to ask courts to permit intervention to enforce EPA requirements. It doesn't, it's not the court's job to set those effluent standards and emissions, which is what the plaintiffs in Hooker were asking the court to do. I don't think Judge, I think Judge Leiden missed that distinction and therefore viewed Hooker as essentially dispositive on this question, even though it's under a different statutory scheme. We think, again. Did you all agree to this thing? Yes, we did. All of this was. Judge Leiden? We did, Your Honor. Did you have an oral argument like you're having now? We, no, there was no, there was no, I'm sorry. I wasn't in the case at that point. Well, but you're the one we got talking here. Your Honor, I see. So you're the one, this is the first time it's been argued. Yes, that is correct, Your Honor. Before a judge or before judges. Yes. Your Honor, I see my time has expired. I'd like to reserve the remainder of my time for rebuttal. Red light, I guess. You saved some time, though. I did. Yeah. Thank you, Your Honor. Mr. Hallinan? Good morning, Your Honors. Daniel Hallinan for the United States, the plaintiff appellee. EPA? That's correct. I represent the United States and I'll be.  Thank you very much, Your Honor. Speak up a little bit. My apologies, Your Honor. I'll be taking 13 minutes of the appellee's time today. Mr. McGarren, who's counsel for the defendant, New Indy, will be taking the remainder of the appellee's time. The United States brought this suit two years ago to abate an imminent. This thing, my style of the case is United States versus Lozano. You two are really on the same side here. You're on the same side. You're taking the same position. We're taking the same position. On intervention, yes, Your Honor. Yes. But we're opposed in district court. We brought this suit against New Indy. Yep. So we brought this suit against New Indy two years ago to abate an imminent public health emergency caused by hydrogen sulfide emissions. Do you have the thing under control yet? The consent decree is in effect and has reduced ambient hydrogen sulfide concentrations below the level set in the consent decree. So, yes, there have not been exceedances of the level set in the consent decree since it was entered. The emissions are under control. The hydrogen sulfide emissions are. Of the United States of America and the EPA. For purposes of this emergency action, yes, Your Honor. And it's important that this was an emergency action under Section 303 of the Clean Air Act and not an enforcement action for violations of other provisions of the Clean Air Act, which the United States could bring under Section 113, which is to say that these two types of actions are different in kind. If the defendant is violating a permit or a regulation, the government can bring an enforcement action. But what we have here is a special authority conferred by Congress in Section 303 on the United States to seek emergency relief, irregardless of any violation of the Clean Air Act. And that's important because the intervention provision that we're talking about here is a lack of parallelism between the government's lawsuit and a suit that a citizen plaintiff might file. And here the Section 303 emergency powers are exclusive to the United States. In the citizen suit provisions of Section 304, Congress did not confer emergency authority on citizen suits. That is not part of the enforcement authorization in that statute. So there's a lack of parallelism between the United States is emergency suit and the citizen suit that the appellants here are seeking to bring in their complaint and intervention. But the appellants, and I asked the same question, but what is your position regarding 304? They're not having any, there's no exemptions in there. It doesn't say you can't under 303 or 113. So the way I read Section 304 is that their authority to bring a suit is limited to violations of standards, limitations, or orders. There's no separate authority in there to abate a public health emergency, which is the authority that Congress specially afforded to the United States in Section 303. And that's important because when you look at other statutes like RCRA, which my colleague on the other side referenced, Congress can sometimes provide those emergency powers to citizen plaintiffs when it thinks that's appropriate. And it did not do so here in the Clean Air Act. And that's what the Hooker case that's been discussed is about. So I think I'd like to just take a second to explain how we think all of these provisions interact and why it results in Judge Leiden's correct conclusion that the Clean Air Act does not afford an unconditional right to intervene here. So the United States- You say Judge Leiden got it right. Yes, Judge Leiden definitely got it right, Ron. What's the standard of review that we apply to Judge Leiden's ruling? I think this court's interpretation of the Clean Air Act is de novo, but the determination whether to permit intervention under Rule 24 is reviewed exclusively for an abuse of discretion. So in that case, standard of review is abuse of discretion as to Judge Leiden's ruling. Correct. Your colleague says it's not. He says we have an absolute right to intervene. We think that if there's a question of interpretation of the Clean Air Act under Rule 24A1, this court would review the statutory interpretation issue de novo. And so we think that part of the case is de novo and the rest of the case is abuse of discretion. You say he's wrong on what he says about having an absolute right to intervene. Yes, we think that that's incorrect and we think Judge Leiden got it right. And that's because the intervention right in Section 304 of the Clean Air Act was set up by Congress as a way to coordinate the government's enforcement suits with citizen suits that are seeking enforcement of EPA or, excuse me, of Clean Air Act standards and regulations. Basically what Congress did is confer general enforcement authority on the United States in Section 113, and then in Section 304, Congress said that citizen plaintiffs could sue for violations of standards, limitations, and orders, except when the United States is bringing a suit already for a violation of the same standard limitation or order with respect to such. And that's important because our Section 303 suit for an emergency abatement, the one that we brought here, is not for a violation of a standard limitation or order. If you look at Section 303, the word violation does not appear anywhere in that provision of the statute. It's not talking about- Great. Yes, Your Honor. Yeah. Mr. Hallinan, is it your position then that the government couldn't combine in a 303 action that it could not combine an assertion of its emergency powers with a separate allegation of a violation of a standard or omission? We could do that. And then we think that the intervention analysis would proceed differently here, differently than it does here. Because if you look at our complaint, and this is at JA 26 to 28, we have one count. It's exclusively a Section 303 count. And because there cannot be a parallel citizen suit seeking to exercise emergency powers, the Section 304 trigger for intervention is not met. If we had brought an enforcement suit, and the plaintiffs were seeking to bring their own enforcement suit for the violation of the same standard that's at issue in our suit, then the analysis would proceed differently. But here- But you do agree, excuse me. You do agree that you could have brought a hybrid suit. We could have brought, but we did not brought. But you did not. Okay. Thanks. And on that point, I want to just briefly address, I think the reference earlier to the consent decree, which includes settlement of a penalty. The government in the consent decree settled any claim it might have brought for a penalty. But that's different from bringing a claim for a penalty. And that's important to this case because, again, their right to intervene is based off of our suit precluding a suit that they might want to bring. Our Section 303 claim does not preclude any suit they might want to bring because they cannot bring a similar suit. And we did not diligently prosecute a claim for a penalty. We settled potential claims, but that also does not preclude any claim that they might want to bring. And we think that's as far as this court needs to go in order to affirm Judge Leiden's ruling below. Basically, because our Section 303 suit does not preclude any suit they might want to bring, Section 304B1B's intervention trigger is not met, and they do not have an unconditional right to intervene under the Clean Air Act. I'll also briefly address the status of EPA's order. We agree, as been discussed this morning, that EPA's temporary order expired in July of 2021. When the government filed suit, it was because that order was expiring, and it needed to obtain new judicial relief from Judge Leiden in the form of an injunction because that order had expired. The appellants here sought to intervene several months later in September of 2021, at which point the EPA's order had already expired. Their suit is seeking to enforce that order prospectively, but that order simply is no longer in effect. It also illustrates why the intervention trigger is not met, because they're seeking to bring a- What do you say they should do? We think that they can bring their own citizen suit, and of course- They can bring an independent lawsuit. Correct, and they have brought several other lawsuits. There's an appeal pending in this court, not from these plaintiffs, but from other plaintiffs, in a case also decided by Judge Leiden, and then there's also a class action pending before Judge Leiden. That's in, I believe, summary judgment briefing right now. So there are other avenues for them to press their claim. I'm sure Mr. McGarren would resist their assertion of those claims, but our view is that the United States emergency action is a separate beast. If they want to pursue their citizen suits, they can do that in their own cases, and that's essentially what Judge Leiden concluded in denying their motion to intervene. Okay, but Mr. Holland, wasn't the problem really that there wasn't a standard or limitation that they could have sued under 304 to enforce? Yes, we think that's correct. We don't think the court needs to reach that issue because this lack of parallelism is enough to decide the case, but I'm happy to speak to that issue as well. Essentially, what we have here is the government coming to court without a preexisting standard or limitation that we are alleging that the defendant violated. We're seeking new judicial relief in the form of an injunction to abate an emergency. We're not seeking to enforce an emission standard or limitation that predated the lawsuit. The appellants view this issue in terms of EPA's temporary administrative order. Again, that order expired, but it also doesn't count as an emission standard or limitation within the meaning of Section 304, the citizen suit provision. We think that that also is a basis for concluding that they can't use Section 304 as an entitlement to intervene in our case because they're not seeking to enforce a standard or limitation as that term is defined within the Clean Air Act. Just to elaborate on that point a little bit more, the temporary order that EPA issued is under Section 303. It is not establishing continuing obligations. It expires after 60 days, potentially subject to a 14-day extension. This is not equivalent to a regulation or something like that. It is a temporary form of relief akin to when the court crafts equitable relief. It's tailor-made to provide protection based off of health-based levels determined by EPA experts. We have, in support of our consent decree, provided ample evidence of why these health-based limits are appropriate. That is not a standard or limitation as that term is understood in Section 304 because it expires and because it is not considered an enforceable action. I think another point to look at on that issue is the way Section 303 is set up. The government does not need to issue these temporary orders before it comes to court seeking emergency relief. I think the way that appellants have conceptualized this case would lead to a sort of strange incongruity where if EPA didn't issue an order, then there would be no entitlement to relief. But because EPA issued a temporary order here that expired, they view that as an enforceable standard or limitation. Their right to intervene, as I understand their position, would be contingent on whether EPA takes this discretionary act, which I don't think is something that Congress would have contemplated. Just quickly on the separate Rule 24 issues, we do think that in an appropriate case, as we've been discussing, plaintiffs can intervene under Rule 24 when the government brings an enforcement... excuse me, an emergency action, but the district court did not abuse its discretion in concluding that under these circumstances, the government adequately represents the public interest in pursuing this emergency relief, and also that participation from these particular appellants under these circumstances would unduly delay the litigation. And for that reason, we'd ask the court to affirm Judge Leiden's ruling below. Thank you, Your Honor. Thank you very much, sir. Mr. McGarren? Yes, Your Honor. John McGarren with Morgan, Lewis & Bacchius. Good to have you with us, sir. Thank you, Your Honor. Welcome to the Fourth Circuit. I'd like to reserve two minutes for rebuttal, so that gives me five minutes. I think it's important, as Mr. Bograd did, to put this in... I didn't have on here that you had reserved anything. Is that an appeal? You have a right to do that. Okay, Your Honor. I'll just go for it. I'd like to put this in context, as Mr. Bograd had attempted to do. Your Honor, this is a paper mill in South Carolina which went through a conversion process. It was essentially a mill that was not very economically productive, and it was acquired in 2019, and New Indy invested hundreds... It was built and started producing different products. Yes, Your Honor, a different form of paper stock. It was converted from a white paper manufacturing operation to brown paper. And during the course of that conversion and startup, there was an upset which led to problems with the wastewater treatment plant and emissions of hydrogen sulfide. Both the State of South Carolina through the South Carolina DHEC and EPA responded. They both issued orders within a week of one another, and as plaintiffs have identified, a Section 303 order under the Clean Air Act is an extremely rare action for EPA to take. New Indy responded immediately to this, entered into efforts to address the requirements of the 303 order. When the 60-day period expired, they entered into negotiations with the United States to resolve the matter. Both the 303 order and ultimately the consent decree contain emissions limits on hydrogen sulfide. Now, it's important to look at that in particular because the definitions that are used in the citizen suit provision deal with emission standards and limitations in their defined terms in the statute. Hydrogen sulfide is not a hazardous air pollutant, and you'll find no regulation in the CFR, nothing in the statute, nothing in EPA guidance relating to these levels of hydrogen sulfide that New Indy agreed to reduce emissions to. There's no other paper mill in the United States, frankly, that operates under these conditions, and these are temporary conditions. The consent decree itself provides that so long as New Indy maintains these levels for a three-year continuous period, the consent decree will terminate. Just like the 60-day order terminated and the parties had to go to court, the parties entered into a consent order which Judge Leiden entered into the court record, and ultimately, Judge Leiden entered a consent decree. It's really important to look at the consent decree itself because the consent decree itself provides that New Indy will apply for a non-Title V permit and then a Title V permit. The Clean Air Act is one of the most complicated statutes in the federal realm, Your Honor, and there are many interrelated provisions, and we can't parse sections of the Clean Air Act in isolation as the plaintiffs have attempted to do here. These types of standards, like hydrogen sulfide, go through rulemaking procedures under the Administrative Procedure Act. There's an opportunity for notice and public comment. New Indy could have resisted the 303 order because EPA sought to impose emissions standards and limitations which didn't exist. So the plaintiff's case relies on essentially a narrow interpretation that the order itself is an emissions standard or limitation, which it is not. It's a temporary measure entered under the emergency powers under Section 303 of the Clean Air Act. Judge Leiden decided this case very narrowly and focused on Section 303 and identified two other circuit court decisions that were on point. The Hooker decision, which was the Second Circuit, focuses on the fact that these, in that case, the citizens were seeking not to enforce standards or limitations. They were seeking to intervene in a case that was... I don't know. That's where she messed up. She relied on that Hooker case. Yes, the Hooker case relied on two different, looked at several different statutes, the Safe Drinking Water Act, RCRA, and the Clean Water Act, and the Clean Water Act provision that Hooker relied on in the analysis in the case that the judge relied on was mainly under the Clean Water Act or still existent today. So that case is still a good analogy to the situation here. And furthermore, the Ninth Circuit in the Volkswagen case decided this issue on point, and that's another case that Judge Leiden relied on heavily in her decision. And the Ninth Circuit and Volkswagen, in looking at the emission defect devices that were circumvented in that case, decided that those were not emission standards and limitations. And again, it's... Volkswagen got caught messing around with the emission. Yes, Your Honor. They had devices in there that essentially cheated and violated a separate section of the Clean Air Act that applies to motor vehicles, Section 202, which is not what we're dealing with here. Well, it's related, Your Honor, in that basically the court found that these were not emission standards or limitations. Emission standards under the Clean Air Act are promulgated standards. And again, there is no standard for hydrogen sulfide that applies to a paper mill. Nevertheless, New Indy cooperated with the federal government, and there's separate actions being pursued, enforcement actions being pursued by the state. As the United States has pointed out, there's been no violations of the consent decree. And the penalty itself, as the United States pointed out in their brief, was focused on violations of the 303 order. They did not bring a 304 penalty action. They brought an action for penalties which was settled in the consent decree with New Indy. And again, the consent decree provides that New Indy is applying for a Title V permit where EPA and the state are both looking at this facility top down, and it'll be determined what standards apply to the facility. The 303 order and ultimately the consent order focus on the imminent and substantial endangerment that EPA determined existed, and New Indy complied with it. Essentially, this case, Your Honor, is moot at this point, unless the court is looking to open up a settlement. And all the work has been done. Many of the things complained about in their complaint and intervention no longer exist. Did you say it's moot? It's moot, Your Honor. Do you think we ought to rule it's moot? Did you all brief that? I do, Your Honor. Yes, we did. Thank you, Your Honor. Thank you. Commissioner Bograd? Thank you, Your Honor. There's a bunch to cover here, but obviously if there are particular issues you'd like me to address, let me know. I'd like to start by responding to the remarks of counsel for the mill. What essentially happened here is that New Indy came in and converted an inefficient mill into a profit-making mill by choosing not to adequately protect the citizens of the county surrounding the mill. They eliminated the steam stripper that was protecting effluent emissions from the plant. They pumped huge amounts of, it's a wonderful term, foul condensate out into this aeration pond so that it would aerosolize and go into the air. What's the watershed there? Your Honor, I'd have to ask my co-counsel about that. I'm actually not from the area. It's the Catawba River, Your Honor. Catawba? Yes. It's down past Charlotte. Exactly, Your Honor. I've been assured it's the Catawba River. Counsel for the mill talks about how they entered into efforts to fix the problem. The fact is that the whole point of the EPA action was that even after the 60 days under the emergency order, they had not solved the problem. Their efforts to respond were, I've forgotten the precise phrase, temporary, intermittent, and uncertain or something like that. And that's why EPA brought the 303 action specifically to enforce compliance, require continued compliance with the provisions of the consent degree. I must disagree with counsel for the mill about hydrogen sulfide not being a regulated product. Indeed, in the separate prevention of significant deterioration lawsuit that is also before this court independently that several people have referenced. One of the issues is that New India made this conversion without getting the required permit because the permit was required because the change to the mill was going to significantly increase their emissions of hydrogen sulfide. So to say it's not a regulated pollutant is just wrong. Do you disagree with that? I do. I most certainly do, Your Honor. What about your position that things moved? Your Honor, it's not moved. This court held... What about his position of subdued discretion? Your Honor, I don't think that I and the EPA necessarily disagree about the standard review. Yes, the question of intervention is fundamentally a discretionary decision, but the case law is very clear that where a denial of intervention... I'm not coming in here. You got up there and said it was not. But when the denial of intervention is based on a misreading of the law, then that... The definition... Applying the wrong law is the definition of discretion. Use your discretion... Yes. That's... So I... Right. So I think I... If a judge makes a legal error, that's an abuse of discretion. Exactly, Your Honor. And I think... So I was conflating those two things and saying the issue here is not abuse of discretion because it was based on a legal error. You're saying Judge Lyden made a legal error. Yes, in her... In misreading... Thereby abuse her discretion. Yes. I hesitate to use that word when it's just a misunderstanding of the law, but that is the technically correct analysis. Which you have to do. Mm-hmm. And the... I'm trying to find the case, Your Honor. We do cite it in our brief on mootness. The CVLR Performance Horses vs. Winn, 792 F3rd 469. It's a decision of this court in 2015 which holds that a challenge to denial of intervention is not moot where the settlement failed to afford the putative interveners all the relief they sought. So clearly, by the standards of that case, this is not moot because we remain dissatisfied and reserve the right to challenge the consent decree on remand if we are correct. At least, I think, you can challenge it in another proceeding. The EPA has... You can do it here. The EPA has taken that position, Your Honor, yes. And, you know, at the same time, the mill has been complaining that we brought too many cases already. So we shall see. We believe the 304B1B gave us an affirmative authorization to intervene in this particular action to challenge the issue. Hooker and VW are different cases. As just like as in Hooker, neither of these... I apologize. I see I'm out of time. I finished this answer, Your Honor. Right ahead. In both Hooker and VW, the court held that the intervener plaintiffs were not seeking to enforce a standard or limitation that was the same as the standard or limitation that led the EPA to bring the underlying suit. We contend that the relief we sought here matches up exactly with the terms of the emergency order. We sought... We were seeking the same relief. It is a standard, an emission standard or limitation, and, therefore, intervention was appropriate. Thank you, Your Honor. Thank you. Mr. McGarren, you said you had a... Another two minutes for some reason? I used my full time, Your Honor. Thank you. Thank you. We appreciate the arguments of counsel. The matter will be taken under submission. And we'll come down, Judge Benjamin and I, and re-counsel and then take up the second case. Judge Kenan will wave at you. Thank you.
judges: Robert B. King, DeAndrea Gist Benjamin, Barbara Milano Keenan